# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

IN RE:

**RECOTON CORPORATION**                    CASE NO. **6:03-CV-734-ORL-28KRS**
**SECURITIES LITIGATION**

_____

CONSOLIDATED CASE NUMBERS:

| 6:03-cv-836-ORL-28KRS | 6:03-cv-884-ORL-28KRS | 6:03-cv-946-ORL-28KRS |
|---|---|---|
| 6:03-cv-861-ORL-28KRS | 6:03-cv-862-ORL-28KRS | |

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration after oral argument on the following motion filed herein:

> **MOTION:**   **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Doc. No. 197)**
>
> **FILED:**      **May 2, 2006**
>
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

## I.   RELEVANT PROCEDURAL HISTORY.

Many plaintiffs filed class action complaints against Arnold Kezsbom, Robert L. Borchardt, and others, arising out of alleged misrepresentations and omissions regarding the operation of Recoton Corporation that were alleged to violate specified securities statutes. The Court consolidated these actions into the present case and ordered that the consolidated cases be captioned "In Re Recoton Securities Litigation." Doc. No. 44. The Court appointed Glenn Costoff as the lead plaintiff under § 21D(a)(3)(B) of the Securities Act of 1934, 15 U.S.C. § 78j(b)

(the "Exchange Act").  Doc. No. 64.  It appointed the law firms of Shalov Stone & Bonner LLP and Vianale & Vianale LLP as co-lead counsel.  *Id.*

Thereafter, Costoff filed a Consolidated Amended Class Action Complaint.  Doc. No. 76. The Court subsequently granted, in part, motions to dismiss this complaint.  Doc. No. 139. Costoff then filed the Second Amended Consolidated Class Action Complaint (the "Second Amended Complaint").  Doc. No. 140.   Pursuant to a motion filed by the defendants, the Court dismissed Count II of the Second Amended Complaint with prejudice, and dismissed portions of Counts I and III relating to a claim of artificially inflated accounts receivable balances.  Doc. No. 165.  The Court denied the motion as to a claim of artificially inflated inventories at InterAct International, Inc. ("InterAct"), Recoton's video and computer games division, alleged in Counts I and III.  *Id.*

In the portion of Count I of the Second Amended Complaint that was not dismissed, Costoff  alleges that Defendants Kezsbom and Borchardt, both of whom were officers and directors of Recoton, violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  Costoff alleges that Kezsbom and Borchardt participated in Recoton's maintenance of inflated, obsolete inventory at InterAct for the purpose of creating increased borrowing potential against the inventory.  Doc. No. 165 at 2-3.[1]  Costoff contends that Recoton misrepresented itself in documents it filed with the Securities and Exchange Commission ("SEC") by doing the following: (1) issuing inventory valuations that did not account

---

[1]        A portion of the summary of the allegations of the Second Amended Complaint is drawn from the order on the motion to dismiss the Second Amended Complaint issued by the Honorable John Antoon, II, presiding District Judge.  Doc. No. 165.

for obsolete inventory; (2) representing that inventories were stated at the lower of cost or market; and (3) representing that inventories were closely controlled. *Id*. at 3. Costoff alleges that he and others who purchased or otherwise acquired Recoton common stock between November 15, 1999 and August 19, 2002 were injured as a result of Kezsbom and Borchardt's material misrepresentations and omissions. Doc. No. 140 at 53.

In the portion of Count III of the Second Amended Complaint that was not dismissed, Costoff alleges that Kezsbom and Borchardt were "controlling persons" who are liable for the misrepresentations and omissions described above under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Doc. No. 140 at 60.

Costoff and proposed class representative Thomas Corkery now ask the Court to certify a class of plaintiffs consisting of all purchasers of the common stock of Recoton Corporation between November 15, 1999 and August 14, 2002, excluding the defendants and other individuals associated with Recoton, Kezsbom or Borchardt, and to appoint them as class representatives. Doc. No. 197 at 1 & n.1. In support of the motion, Costoff and Corkery filed the following documents:

- Declaration of Lee S. Shalov, Esq., doc. no. 198-1 ("Shalov Decl.");

- Report of Candace L. Preston, doc. no. 198-2 ("Preston Report");

- Joint Declaration of Glenn Costoff and Thomas Corkery in Support of Motion for Class Certification, doc. no. 198-3 ("Joint Decl.");

- The Firm Resume of Shalov Stone & Bonner LLP, doc. no. 198-4; and

- The Firm Resume of Vianale & Vianale LLP, doc. no. 198-5.

Kezsbom and Borchardt filed a memorandum in opposition to the motion for class certification.  Doc. No. 209.  In support of their opposition, they filed the following documents:

- Revised Declaration of Albert M. Myers, doc. no. 211 ("Myers Decl.");[2]

- Chart of Institutional Holding prepared by Thomson Financial, doc. no. 210-2;

- Recoton Forms 14A for the years 2000, 2001, and 2002, doc. no. 210-3;

- Declaration of Glenn Costoff in Further Support of Motion to Be Appointed Lead Plaintiff, doc. no. 210-4 ("Costoff Decl.");

- Declaration of Thomas Corkery Submitted Pursuant to Magistrate Judge Spaulding's September 29, 2003 Order, doc. no. 210-5 ("Corkery Decl.");

- Plaintiffs' First Supplemental Responses to Defendants' First Requests for Admission to Plaintiffs, doc. no. 210-6  ("Plaintiffs' Admissions");

- Certification of Named Plaintiff Thomas J. Corkery, doc. no. 210-7 ("Corkery Cert.);

- Recoton Purchases by Glenn Costoff 3/5/98 - 8/5/02, doc. no. 210-8, ("Costoff Purchase Summary");

- Recoton Corporation Average Daily Closing Price August 15 - November 12, 2002, doc. no. 210-9 ("Recoton Average Closing Price");

- Declaration of Albert M. Myers filed in support of the motion to dismiss the Consolidated Class Action Complaint, doc. no. 210-10 ("2004 Myers Decl.");

- Recoton Form 10-K for 1999, doc. nos. 210-11 through 210-14;

- Recoton May 4, 2000 Press Release, doc. no. 210-15;

- Report of Ryan, Beck & Co. dated May 5, 2000, doc. no. 210-16;

- Transcript of May 5, 2000 conference call, doc. no. 210-17;

- *Orlando Sentinel* article dated May 6, 2000, doc. no. 210-18;

---

[2]     This declaration supersedes the Declaration of Albert M. Myers, doc. no. 210-1.

- Recoton Form 10-Q for the first quarter of 2000, doc. no. 210-19;

- Recoton August 9, 2000 Press Release, doc. no. 210-20;

- Transcript of August 10, 2000 conference call, doc. no. 210-21;

- Recoton Form 10-Q for the second quarter of 2000, doc. no. 210-22;

- Recoton November 2, 2000 Press Release, doc. no. 210-23;

- Transcript of November 3, 2000 conference call, doc. no. 210-24;

- Recoton Form 8-K filed on November 13, 2000, doc. no. 210-25;

- *Wall Street Journal* article dated January 31, 2001, doc. no. 210- 26;

- Recoton Form 10-Q for the third quarter of 2000, doc. no. 210-27;

- Recoton December 28, 2000 Press Release, doc. no. 210-28;

- Recoton February 26, 2001 Press Release, doc. no. 210-29;

- Report of Morgan Keegan & Company, Inc. dated March 14, 2001, doc. no. 210-30;

- Recoton Form 10-K for 2000, doc. no. 210-31 through 210-34;

- Recoton May 9, 2001 Press Release, doc. no. 210-35;

- Report of Morgan Keegan & Company, Inc. dated May 11, 2001, doc. no. 210-36;

- Report of Ryan, Beck & Co. dated June 8, 2001, doc. no. 210-37;

- Recoton August 6, 2001 Press Release, doc. no. 210-38;

- Report of Morgan Keegan & Company, Inc. dated August 8, 2001, doc. no. 210-39;

- Recoton Form 10-Q for the second quarter of 2001, doc. no. 210-40;

- Recoton October 30, 2001 Press Release, doc. no. 41;

- *Dow Jones News Service* article dated October 30, 2001, and *Reuters News* article dated October 31, 2001, doc. no. 42;

- Recoton November 5, 2001 Press Release, doc. no. 210-43;

- Report of Morgan Keegan & Company, Inc. dated November 7, 2001, doc. no. 210-44;

- Report of Ryan, Beck & Co. dated November 7, 2001, doc. no. 210-45;

- Recoton Form 10-Q for the third quarter of 2001, doc. no. 210-46;

- *Global and Mail* internet article posted on July 6, 2006, *Itnews* internet article dated April 14, 2005, *ABC News* internet article, *CMPnet Asia* internet article dated May 26, 2006, *News* internet article last modified January 2, 2002, *Infineon Online News* internet article dated January 21, 2002, *Spherion News* internet article dated October 25, 2004, *India Infoline* internet article dated October 11, 2005, doc. no. 210-47;

- Recoton February 27, 2002 Press Release, doc. no. 210-48;

- Report of Jefferies Interactive Entertainment Software dated February 28, 2002, doc. no. 210-49;

- Report of Morgan Keegan & Company, Inc. dated February 28, 2002, doc. no. 210-50;

- Report of Ryan, Beck & Co. dated February 28, 2002, doc. no. 210-51;

- *Orlando Sentinel* article dated February 28, 2002, doc no. 210-52;

- *Canadian Corporate Newswire* article dated February 28, 2002, doc. no. 210-53;

- *Dow Jones News Service* article dated February 27, 2002, doc. no. 210-54;

- *Reuters News* article dated February 27, 2002, doc. no. 210-55; and

- Plaintiffs' Second Supplemental Response to Defendants' First Request for Admission to Plaintiffs, doc. no. 210-56.

Costoff and Corkery filed a reply to Kezsbom and Borchardt's response.  Doc. No. 213.  In support of the reply memorandum, Costoff and Corkery relied on the following:

- Declaration of Lee Shalov dated July 14, 2006 and supporting exhibit, doc. no. 213-2 ("July 2006 Shalov Decl."); and

• Affidavit of Glenn Costoff dated July 8, 2006, doc. no. 213-3 ("July 2006 Costoff Aff.").[3]

The motion has been referred to me for issuance of a report and recommendation by the Honorable John Antoon, II, presiding district judge.

## II.   FACTUAL BACKGROUND.[4]

A.   *Recoton.*

Recoton, formed in 1936, is a company that manufactured video and computer game accessories, which were primarily marketed under the brand name "InterAct."  Doc. No. 140 ¶¶ 12, 13.  Recoton also marketed and produced a wide array of electronic products.  Doc. No. 140 ¶ 15.  The company was formally headquartered in Lake Mary, Florida and employed over four thousand employees.  Doc. No. 140 ¶ 12.  Throughout the class period, Recoton's stock traded on the NASDAQ exchange.  Doc. No. 140 ¶ 12; *see also* Preston Report ¶ 17.  In the year 2000, the NASDAQ listed the stock of more than 4,700 companies and reported annual trading volumes of more than 400 billion shares.  Preston Report ¶ 27.

---

[3]       Costoff sought leave to supplement his reply to the motion with additional evidence.  Doc. No. 214.  Defendants objected to this request because it was made shortly before the hearing on the motion for class certification.  I denied the motion and have not considered the additional evidence that Costoff proffered.  Doc. No. 219.

[4]       The merits of the plaintiffs' claims are not to be evaluated in considering whether the requirements of Rule 23 of the Federal Rules of Civil Procedure are satisfied.  *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987).  Nevertheless, a court "may look beyond the allegations of the complaint in determining whether a motion for class certification should be granted."  *Id.*  "It is necessary to analyze the plaintiffs' factual allegations, the record evidence pertinent to class action issues, and the applicable law in order to understand and evaluate the propriety of the class action device . . . ."  *Anderson v. Bank of the South*, 118 F.R.D. 136, 138 (M.D. Fla. 1997).  Consequently, in presenting the factual background, this Report and Recommendation includes all relevant facts, not just those found in the complaint.

Price and share volume for Recoton stock trading on the NASDAQ was reported in daily financial publications through such newspapers as the *Wall Street Journal* and *New York Times*. Preston Report ¶ 21.  Information was also available to investors through electronic systems, such as Bloomberg, and over the Internet.  Preston Report ¶ 21.

As Recoton was traded on the NASDAQ, it was required to make filings with the SEC. Preston Report ¶ 25.  Recoton's filings with the SEC disclosed financial statements and discussed business conditions, acquisitions, and other matters affecting the stock price.  Preston Report ¶ 25. Between September 1999 and August 2002, Recoton filed 35 documents with the SEC.  Preston Report ex. D.

Recoton further informed the public about its business activities through press releases. Preston Report ¶ 22.  During the proposed class period, Recoton issued more than 30 press releases concerning its financial results and product development.  Preston Report ¶ 22.

Information regarding Recoton was also provided to the public in reports by analysts who followed Recoton stock and the stock of its competitors.  Preston Report ¶ 23.  During the proposed class period, analysts from the brokerage firms of Jefferies & Co., Inc., Ryan, Beck and Co., Morgan Keegan & Co., and Stifel Nicolaus & Co. all issued reports concerning Recoton's financial condition and estimated future earnings and provided recommendations on Recoton's stock.  Preston Report ¶ 23.

Candace L. Preston, a valuation and securities analyst retained as an expert witness by Costoff, analyzed Recoton's disclosures.[5]  Preston concluded that Recoton was traded on an

---

[5]     Preston's qualifications are discussed in her report, which she signed under oath.

efficient market.  Preston Report ¶ 42.   In reaching this conclusion, she considered a number of

factors, as follows:

(a)      whether the stock was actively traded, as evidenced by a large
         weekly volume of stock trades . . .;[6]

(b)      whether a significant number of securities analysts followed and reported on the
         stock during the class period;

(c)      whether the stock had numerous market makers;

(d)      whether the company was eligible to file a Form S-3 Registration
         Statement . . . in connection with public offerings; and

(e)      the existence of empirical facts that show a cause and effect
         relationship between unexpected corporate events and financial
         releases and an immediate response in the stock price.

Preston Report ¶ 15 (citing *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)).  Among other

things, Preston performed mathematical analyses of the daily performance of Recoton stock as

compared with the Russell 2000 Index to support her conclusions.  Preston Report ¶¶ 32-39.

According to Preston, as of November 15, 1999, there were more than 12 million common

shares of Recoton issued and outstanding.  Preston Report ¶ 17.  Of these outstanding shares,

institutional investors, which include pension funds, mutual funds, banks, and other professional

investors, owned approximately 49% of the outstanding shares.  Preston Report ¶ 17.  In its Form

10-K for fiscal year 1999, Recoton stated that, as of March 15, 2000, there were more than 387

owners of record.  Doc. No. 210-11 at 17; Preston Report ¶ 18.  Preston opined that there were

---

[6]      Lee S. Shalov, counsel for the proposed class, averred based on data received from
Bloomberg that Recoton shares traded every day of the class period, with an average daily volume
of approximately 50,000 shares.  July 2006 Shalov Decl. ¶ 3.

quite possibly even more shareholders, as the reported number of shareholders usually excludes shareholders whose shares are held by brokers in street name.  Preston Report ¶ 18.

Albert M. Myers, counsel for the defendants, came to similar conclusions.  He averred, based on data received from Thomson Financial, that from November 1999 to August 2002, there were 99 different institutional investors who owned stock in Recoton.  Myers Decl. ¶ 2; Doc. No. 210-2.  In any three month interval, there was an average of 30 institutional investors, owning between 33% and 59% of all of Recoton's outstanding common stock.   Myers Decl. ¶ 2; Doc. No. 210-2.  Between November 1999 and August 2002, there was an average of 13,171,444 total shareholders.  Myers Decl. ¶ 2.  Insiders excluded from the proposed class held, on average, 19.9% of the outstanding stock.  Myers Decl. ¶ 3.   Based on these numbers, Myers hypothesizes that the 387 non-institutional shareholders owned approximately 13, 931 shares each.  Based on a hypothetical loss of $3.00 per share, Myers further hypothesizes that each non-institutional shareholder had damages of more than $40,000.  Myers Decl. ¶ 4.

> B.    *Recoton's Disclosures and the Allegations of the Second Amended Consolidated Class Action Complaint.*

Costoff alleges that by the end of 1999, Recoton had a large supply of video and computer game accessory inventory that had become obsolete.  Doc. No. 140 ¶¶ 30-31.  Nevertheless, in its September 30, 1999 Form 10-Q filed with the SEC on November 15, 1999, Recoton was silent about the growing inventory problem.  Doc. No. 140 ¶ 32.  Costoff alleges that subsequent SEC filings were also silent about the obsolete inventories.  Doc. No. 140 ¶ 37.  Costoff asserts that Recoton's silence directly contradicted the GAAP principle that a loss should be recognized during the period when the utility of goods will be worth less than cost.  Doc. No. 140 ¶ 34 vii.

Myers avers that problems with InterAct's performance were revealed.  On March 30, 2000, Recoton filed a Form 10-K for 1999 in which it disclosed that net sales were down at InterAct as compared to the previous year.  Myers Decl. ¶ 13 & ex. J.  On May 4, 2000, Recoton issued a press release announcing its results for the first quarter of 2000 in which it noted that positive results in parts of the company "had been 'masked by . . . the performance of our video game division."  Myers Decl. ¶ 14, ex. K at 1.  The next day, a securities analyst commented that the first quarter performance showed "that InterAct would be 'a drag until more new platforms are introduced.'"  Myers Decl. ¶ 15 & ex. L at 23.  Also on May 5, 2000, Borchardt stated in a conference call with securities analysts "that '[d]espite the improvements in the audio and accessories segment, [Recoton was] dragged down by losses in the video game segment.'"  Myers Decl. ¶ 16 & ex. M at 2.  On May 6, 2000, the *Orlando Sentinel* reported that Borchardt had attributed Recoton's overall loss for the first quarter "to 'a downturn in the video-game industry.'"  Myers Decl. ¶ 17 & ex. N.

Myers further avers that additional disclosures were made in August 2000 about the problems at InterAct.  An August 9, 2000 press release announcing second quarter results for 2000 stated that positive results in other parts of the company were masked by the performance of the video game segment.  Myers Decl. ¶ 19 & ex. P at 1.  In a conference call on August 10, 2000, Borchardt told analysts that InterAct "'continue[d] to have another poor quarter with significant net loss . . . it's the difference between a loss and a profitable first half.'"  Myers Decl. ¶ 20 & ex. Q at 3.  Recoton's Form 10-Q for the second quarter of 2000, issued on August 14, 2000, confirmed that net sales for Recoton were down "due primarily to lower sales at InterAct and the elimination of product lines."  Myers Decl. ¶ 21 & ex. R, item 2.

In November 2000, Recoton issued a press release announcing its results for the third quarter of 2000.  Once again, it reflected that the company's positive results in other segments had been "'offset'" by InterAct's performance.  Myers Decl. ¶ 22 & ex. S at 1-2.  In a conference call on November 3, 2000, Borchardt told analysts that "overall results 'continue to be dragged down by' InterAct's results."  Myers Decl. ¶ 23 & ex. T at 3.  On November 13, 2000, Recoton issued its Form 8-K reporting that it had refinanced senior indebtedness and disclosing financial covenants made in support of the refinancing.  Myers Decl. ¶ 24 & ex. U.  In reporting on this refinancing, the *Wall Street Journal* wrote that Kezsbom indicated that Recoton had pledged all of its assets as collateral for a loan, including "'warehoused inventory such as stereo speakers and video-game joysticks . . . .'"  Myers Decl. ¶ 25 & ex. V.  Similarly, Recoton's Form 10-Q for the third quarter of 2000, issued on November 14, 2000, attributed decline in net sales to lower sales at InterAct, among other things.  Myers Decl. ¶ 26 & ex. W, item 2.

Recoton's subsequent disclosures in December 2000 and February 2001 continued to attribute losses to the performance of InterAct.  Myers Decl. ¶¶ 27 & 28, exs. X & Y.

On March 14, 2001, a securities analyst noted "that Interact 'has traditionally been [Recoton's] strongest profit provider; however, the anticipation of new gaming platforms has slowed accessory sales for the old platforms.  As a result, both gross and operating margins have suffered over the past three years.'"  Myers Decl. ¶ 29 & ex. Z at 4.  On March 30, 2001, Recoton filed a Form 10-K for 2000 in which it disclosed that "net sales were down" from 1999, primarily attributed to lower sales at InterAct.  Myers Decl. ¶ 30 & ex. AA, item 7.

In a May 9, 2001 press release announcing Recoton's results for the first quarter of 2001, Recoton "reported a net loss of $2.8 million and called attention to 'the effect that InterAct's

results have had on overall performance . . . .'" Myers Decl. ¶ 31 & ex. BB at 1.  Commenting on

Recoton's first quarter results, on May 11, 2001, a securities analyst issued a report stating that

"reduced margins at InterAct were 'primarily the result of deep discounts of aging inventory in

order to make room for more next generation accessories.'" Myers Decl. ¶ 32 & ex. CC at 1.  On

June 8, 2001, another securities analyst commented on Recoton's first quarter results, stating that

"losses were greater than [the securities analyst's] original expectations due to continuing

weakness from the InterAct division which continues to be in transition.'" Myers Decl. ¶ 33 & ex.

DD at 1.

On August 6, 2001, Recoton issued a press release announcing its results for the second

quarter of 2001 in which it noted that the "'video game segment continued to suffer because of the

industry-wide transition period that persisted through the second quarter . . . .'" Myers Decl. ¶ 34

& ex. EE at 2.  In a August 8, 2001 report commenting on Recoton's second quarter results, a

securities analyst stated that Recoton's loss "'was primarily the result of weaker than expected

sales in the video game accessory division . . . .'" Myers Decl. ¶ 35 ex. FF at 1.

On August 14, 2001, Recoton filed a Form 10-Q for the second quarter of 2001, in which it

disclosed that "net sales were down overall, primarily attributable to lower sales at InterAct and

other factors." Myers Decl. ¶ 36 & ex. GG, item 2.  On October 30, 2001, Recoton issued a press

release stating that it was "lowering its fourth-quarter estimated net income . . . ." Myers Decl. ¶

37 & ex. HH at 1.  On that same day, *Reuters* and the *Dow Jones News Service* reported that

"Recoton's anticipated third- and fourth-quarter results were significantly below estimates of

analysts." Myers Decl. ¶ 38 & ex. II.

In a November 5, 2001 press release announcing Recoton's results for the third quarter of 2001, Recoton reported that "sales and gross margins were down at InterAct, 'primarily attributable to the pricing pressures on products compatible with legacy video game platforms.'" Myers Decl. ¶ 39 & ex. JJ at 2.  On November 7, 2001, securities analysts issued reports commenting on Recoton's third quarter results.  Myers Decl. ¶ 40-41.  One securities analyst's report noted that inventories at Recoton had increased.  Myers Decl. ¶ 40 & ex. KK at 3.  Another analyst stated that Recoton's video game segment was "[o]f continuing concern" and that "[t]his should have been the turnaround quarter" for sales.  Myers Decl. ¶ 41 & ex. LL at 2.

Contrary to the allegations that Recoton's SEC filings did not disclose its excess video game accessory inventory, the defendants claim that their November 14, 2001 Form 10-Q, filed with the SEC, made this disclosure.  Myers Decl. ¶ 42.  Recoton's Form 10-Q stated that there had been some losses at InterAct caused by "'pricing pressures on products associated with legacy [i.e., older] video game platforms.'"  Myers Decl. ¶ 42 & ex. MM, item 2 at 12-13.  Because Recoton had disclosed the terms of its financial covenants with its lenders in a Form 8-K no later than November 2000, Myers Decl. ¶ 24 & ex. U, Recoton claims that its shareholders should have recognized the possibility that the company could go into default.  Doc. No. 209 at 16.  Recoton suggests that securities analysts noted the pressures placed on Recoton's financials by InterAct's obsolete inventory.  Myers Decl. ¶¶ 29, 32, 40, 41 & exs. Z, CC, KK, LL.

Costoff alleges that Recoton first partially revealed the truth about its inventory on February 27, 2002.  Doc. No. 140 ¶ 43.  In a press release, Recoton announced an anticipated a $2.3 million fourth quarter loss and a $7.5 million loss for the year due to the "'conclusion of the recent industry transition' in the video gaming industry and the 'sell through of legacy platform

inventories.'"  Myers Decl. ¶ 45 & ex. OO.  Recoton further announced that it had breached

financial covenants and was in negotiation with its lenders.  Myers Decl. ¶ 45 & ex. OO.

The February 27, 2002 press release resulted in a substantial drop in the price of Recoton's

stock.  Doc. No. 140 ¶ 45.  Recoton's stock dropped from $8.67 per share on February 26, 2002,

to $4.76 on February 28, 2002, the day following the announcement.  Doc. No. 140 ¶ 45.

However, Costoff alleges that this was not a complete disclosure because Recoton stated that the

InterAct segment should regain profitability by the end of the year.  Doc. No. 140 ¶ 46; Doc. No.

210-48.  On February 28, 2002, a number of securities analysts criticized Recoton and its

management, Myers Decl. ¶¶ 46-48 & exs. PP, QQ, RR, and there was widespread media coverage

of Recoton's loss.  Myers Decl. ¶ 49 & exs. SS, TT, UU, VV.

Costoff alleges that on August 14, 2002, Recoton issued a press release disclosing for the

first time that it needed to write down inventory at InterAct in the amount of $12.8 million and

reevaluate $4.7 million of assets.  Doc. No. 140 ¶ 47.  Recoton's stock price dropped from $2.40

on August 14, 2002, to $2.09 on August 15, 2002.  Doc. No. 140 ¶ 49.  By September 30, 2002,

approximately six weeks after its disclosure, Recoton's shares had fallen to $0.60 per share.  Doc.

No. 140 ¶ 49.

On August 19, 2002, Recoton filed its June 30, 2002 Form 10-Q.  Doc No. 140 ¶ 34 i.  In

this document, the company recorded restructuring and other charges of approximately $20.6

million for inventory write-downs, revaluation of assets, employee severance, forgiveness of

officers' receivables, and customer concessions.  *Id.*

On November 18, 2002, Recoton filed its September 30, 2002 Form 10-Q, noting that it

had recorded a loss of $43,525,000 in its video and computer game operations and UK operations.

Doc. No. 140 ¶ 34 ii.  Costoff alleges that these losses arose from a writedown of inventory that

had been improperly deferred in an effort to conceal the fact that the company's assets and net

worth were materially overstated.  Doc. No. 140 ¶ 34 iii.  Recoton filed for bankruptcy shortly

thereafter.  Doc. No. 197 at 4.

> C.      *Proposed Class Representatives Costoff and Corkery.*

Costoff and proposed class representative Corkery seek to have certified a class of

plaintiffs consisting of all purchasers of Recoton common stock between November 15, 1999 and

August 14, 2002, excluding Kezsbom and Borchardt and other individuals associated with

Recoton, and to have the Court appoint them as class representatives.  Doc. No. 197.  Costoff and

Corkery aver that they have reviewed the pleadings and key motion papers, and they have

expressed a willingness to appear and testify at depositions and at trial.  Joint Decl. ¶ 4.  Costoff

alleges that he suffered $718,207.42 in damages. Costoff Decl. ex. A. Corkery alleges that he

suffered $32,672.50 in damages. Corkery Decl. ¶ 2.

Costoff owned 48,200 shares of Recoton stock before February 27, 2002, the date on

which Recoton first allegedly made a partial disclosure of its obsolete inventory.  Costoff Decl. ex.

B.  He purchased 111,800 additional shares, for a total of 160,000 shares, after February 27, 2002.

Costoff Decl. ¶ 2.  Costoff also sold shares of Recoton stock within the proposed class period.

Myers Decl. ¶ 7 & ex. A.  Costoff admits that on at least three occasions, he bought and sold

Recoton stock within five trading days.  Myers Decl. ¶ 7; Doc. No. 210-6 ¶ 14.  Costoff owned

154,000 shares of stock at the end of the proposed class period.  Costoff Decl. ex. A.

Corkery did not own any shares of Recoton stock before February 27, 2002.  He purchased

27,000 shares of stock between March 1, 2002, and June 7, 2002.  Corkery Decl. ¶ 4(a).  He

purchased an additional 3,000 shares after August 14, 2002.  Myers Decl ¶ 6.  Corkery owned

25,000 shares of stock at the end of the proposed class period.  Doc. No. 15 at 24.  He also bought

and sold stock in transactions separated by seven or fewer trading dates on at least five occasions.

Myers Decl. ¶ 7.

Costoff admits "[t]hat at the time some members of the Class bought Recoton common

stock, they did so in the belief that the market price of Recoton common stock did not reflect its

true value."  Myers Decl. ¶ 50; Doc. No. 210-56 ¶ 10.  In a subsequent declaration, Costoff

attempted to clarify the admission by attesting that he believed that the market price for the

Recoton stock was valid and that he did not have any knowledge that it was inflated.  July 2006

Costoff Aff.¶ 6.  Despite this, based on his own evaluation of the information concerning the

company, Costoff believed that the stock price would go up.  July 2006 Costoff Aff.¶ 7.

The proposed class is represented by the law firms of Shalov Stone & Bonner LLP and

Vianale & Vianale LLP.  Doc. No. 194 at 4.  The law firm of Shalov Stone & Bonner LLP

specializes in representing plaintiffs in securities class actions.  Doc. No. 198-4 at 2.  In the past

six years, the firm has been appointed lead counsel or co-lead counsel for plaintiffs in at least

thirteen federal securities class actions.  Doc. No. 198-4 at 3.  The firm of Vianale & Vianale LLP

also has experience representing investors in class actions under federal securities laws.  Doc. No.

198-5 at 2.  Mr. Vianale alone has twenty years of experience in securities litigation.  Doc. No.

198-5 at 2.

### III.    CLASS CERTIFICATION STANDARD.

To qualify for class certification, the plaintiffs must show that the four requirements of

Rule 23(a) of the Federal Rules of Civil Procedure are satisfied and that one of the subdivisions of

Rule 23(b) is applicable. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 721 (11th Cir. 1987).

Rule 23(a) allows a class to be certified if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there
> are questions of law or fact common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition, as the plaintiffs are seeking certification under Rule 23(b)(3),

they must show that: (1) there are questions of law or fact common to the members of the class

that predominate over those questions affecting individual class members only, and (2) a class

action is superior to other available methods for fair and efficient adjudication of the controversy.

In examining whether the plaintiffs have satisfied their burden under Rule 23, the Court is

not to evaluate the merits of plaintiffs' claims. *Kirkpatrick*, 827 F.2d at 722.  However, the

Eleventh Circuit has held that the limitation on examining the merits "should not be talismanically

invoked to artificially limit a trial court's examination of the factors necessary to a reasoned

determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class

action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984).  Thus, the Court

may look beyond the complaint in determining whether a motion for class certification should be

granted. *Kirkpatrick*, 827 F.2d at 722.

The case law is clear that class actions are "a particularly appropriate means for resolving

securities fraud actions." *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 427 (S.D. Fla. 1991).

Additionally, "'the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action.'" *Id.* (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985)).

It is well settled that issues concerning class certification are left to the discretion of the district court. *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1348 (11th Cir. 1983); *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038-39 (5th Cir. Unit A July 1981) (stating that class certification issues in a securities fraud case are "left to the sound discretion of the district court.").

## IV.   ANALYSIS.

### A.   Numerosity.

Defendants argue that the numerosity requirement has not been met because Costoff has not quantified the number of purchasers of Recoton stock during the proposed class period, and he has not shown that it would be impracticable for investors to bring individual actions. Doc. No. 209 at 2.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable . . . ." Whether Rule 23(a)(1) has been satisfied depends upon the specific facts of each case. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489-90 (S.D. Fla. 2003); *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 324 (S.D. Fla. 1996). There is no definite standard as to whether there are sufficient class members and whether the members are of sufficient character to satisfy this requirement. *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 696 (S.D. Fla. 1992). In determining whether joinder is impracticable, the court must consider a number of factors, with the size of the class being the most important. *Walco Invs., Inc.*, 168 F.R.D. at 324. Some of the

other factors are "the geographic diversity of the class members, the nature of the action, the size

of each plaintiff's claim, judicial economy and the inconvenience of trying individual lawsuits,

and the ability of the individual class members to institute individual lawsuits." *Id.*; *see also*

*Zeidman*, 651 F.2d at 1038.

The first factor to consider is the size of the class.  Defendants argue that the proof of

numerosity is insufficient here because Costoff did not present evidence of the number of

shareholders who purchased Recoton stock during the proposed class period.  However, case law

provides that, in considering the class size, the plaintiffs need not show the precise number of

class members, but they must offer some evidence or reasonable estimate as to the number.  *Walco*

*Invs., Inc.*, 168 F.R.D. at 324.  Moreover, the numerosity requirement is "generally assumed to

have been met in class action suits involving nationally traded securities."  *Zeidman*, 651 F.2d at

1039; s*ee also Cheney*, 213 F.R.D. at 490; *CV Reit, Inc.*, 144 F.R.D. at 696; *In re Amerifirst Sec.*

*Litig.*, 139 F.R.D. at 427.

Here, Costoff offers evidence that, during the class period, there were, on average, 13

million shares of outstanding Recoton stock, and, as of March 15, 2000, more than 387 owners of

record.  Preston Report ¶ 17; Myers Decl. ¶ 2.  Some courts have found this sufficient on its own

to establish numerosity.  *See, e.g., Tapken v. Brown*, No. 90-691-CIV-MARCUS, 1992 WL

178984, at *27 (S.D. Fla. Mar. 13, 1992) (finding the plaintiffs' allegation that there were 8.4

million shares of outstanding common stock to be sufficient in satisfying the numerosity

requirement); *see also Cheney*, 213 F.R.D. at 490 (noting that, in a case in which numerosity was

not contested, a company with 8,775,228 shares of outstanding stock satisfied the numerosity

requirement).

The remaining factors all favor finding numerosity.  As this is a nationally traded security, class members will be located throughout the country.  Judicial economy also supports satisfaction of the numerosity requirement because it avoids numerous individual lawsuits.  *Zeidman*, 651 F.2d at 1038-39.

The defendants' argument that the numerosity requirement is not satisfied is largely based on *O'Neil v. Appel*, 165 F.R.D. 479 (W.D. Mich. 1996).   In *O'Neil*, the plaintiffs argued that the court should presume that the numerosity requirement was satisfied because there were 8 million shares outstanding and there were 346 shareholders.  *Id.* at 485, 489.  The court stated that, while a presumption of numerosity is sometimes appropriate, especially when a stock is traded on a major stock exchange like the New York Stock Exchange, it was not appropriate based on the facts in that case.  *Id*. at 489.  The *O'Neil* court focused on the fact that the stock did not have a trading history because the company was formed less than a month before the beginning of the proposed class period and that, during the class period, the stock only averaged a total of seven trades per day.  *Id.* at 485-86.  Thus, it had none of the attributes of an efficient market.  *Id.* at 486.  Additionally, while there were 8 million outstanding shares, most of these shares were owned by just two insiders, who were expressly excluded from the class.  *Id.* at 489.  The *O'Neil* court concluded that the numerosity requirement was not satisfied because "the record was devoid of any direct evidence concerning the number of purchasers of common stock during any period, and the facts . . . admit of no presumption concerning a large number of purchasers."  *Id.*

The facts in the present case are distinguishable from those in *O'Neil*.  In this case, Recoton had been in existence for almost seventy years, and its stock was traded on the NASDAQ. There is also evidence that Recoton shares traded every day of the class period, with an average

daily volume of approximately 50,000 shares.  July 2006 Shalov Decl. ¶ 3.  Recoton insiders

owned less than 20% of the outstanding stock.  Myers Decl. ¶ 3.  Additionally, Candace L.

Preston, a valuation and securities analyst, concluded that the market for Recoton stock was

efficient after conducting the analysis described in her report.  The record before this Court,

therefore, demonstrates that the market for Recoton stock was developed and efficient, and the

number of shareholders of Recoton stock supports a finding that the numerosity requirement has

been satisfied.

     As to the defendants' argument that individual class members have a financial incentive to

pursue individual claims, this is only one factor among many that the courts consider.  *Walco Invs.

Inc.*, 168 F.R.D. at 324.  Even if it were presumed that the defendants have enough of a financial

incentive to pursue individual claims, the other factors of the numerosity requirement have been

satisfied.  *Camden Asset Mgmt. v. Sunbeam Corp.*, No. 99-CV-8275, 2001 WL 34556527, at *4

(S.D. Fla. July 3, 2001) (holding that even though the class was made up of large institutional

investors with a financial incentive to bring individual claims, the numerosity requirement was

satisfied).  As analyzed above, the rest of the factors demonstrate that joinder is impracticable,

resulting in the satisfaction of the numerosity requirement.

     B.     *Commonality.*

     The defendants do not challenge the commonality requirement for class certification and

acknowledged at oral argument that there are some common questions of law or fact.  As there is

no objection, I will only briefly address this requirement.

     Rule 23(a)(2) requires that there are "questions of law or fact common to the class . . . ."

"The threshold for commonality is not high."  *Cheney*, 213 F.R.D. at 490 (citing *Forbush v. J.C.*

*Penny Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)).  In order for the commonality requirement

to be satisfied, there must be at least one issue affecting all, or a significant number, of the class

members.  *Id.*  When a plaintiff alleges that there is a common scheme of deceptive conduct to

defraud investors, the issue affects all class members, and the commonality requirement is

satisfied.  *See Avery v. Uniroyal Tech. Corp.*, No. 8:02CV2238T27MAP, 2005 WL 1205607, at *3

(M.D. Fla. May 20, 2005); *Cheney*, 213 F.R.D. at 491; *Walco Invs., Inc.*, 168 F.R.D. at 325.

        In this case, Costoff alleges a number of questions of fact and law that are common to all

class members.  The questions alleged in the complaint include: (1) whether the defendants

violated federal securities laws through misrepresentations concerning Recoton's inventory; (2)

whether a fraudulent scheme was deployed by defendants; (3) whether Recoton's stock prices

were artificially inflated during the class period due to material omissions and misrepresentations;

and (4) whether the defendants' acts caused damages suffered by the plaintiffs and other class

members.  Doc. No. 197 at 9.  Therefore, because there are universal issues of fact and law and

Costoff has alleged that there was a common scheme to defraud the investors, the commonality

requirement is satisfied.

        C.      *Typicality.*

        The defendants object to a finding of typicality on two grounds.  First, the defendants argue

that Costoff and Corkery are atypical because they purchased most of their stock after Recoton

made its first disclosure revealing the fraud.  Secondly, the defendants assert that Costoff admitted

that some members of the proposed class bought Recoton stock with the belief that the market

price of the stock did not reflect its true value.

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The plaintiffs' claims are typical if they "have the same essential characteristics as the claims of other members of the class." *In re Amerifirst Sec. Litig.*, 139 F.R.D. at 428 (citing *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985)). This requirement is satisfied "if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory." *Cheney*, 213 F.R.D. at 491 (citing *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984)). "[T]he typicality requirement . . . may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *Appleyard*, 754 F.2d at 958. "Any atypicality or conflict between the named Plaintiffs' claims and those of the class 'must be clear and must be such that the interests of the class are placed in significant jeopardy.'" *Walco Invs. Inc.*, 168 F.R.D. at 326 (quoting *Sley v. Jamaica Water & Utilities, Inc.*, 77 F.R.D. 391, 394-95 (E.D. Pa. 1977)); *see also In re Amerifirst Sec. Litig.*, 139 F.R.D. at 428 ("[A] strong similarity of legal issues will suffice despite substantial factual differences.") (citing *Appleyard*, 754 F.2d at 958).

Costoff alleges that the defendants' fraud was first partially revealed on February 27, 2002. Costoff owned 48,200 shares before February 27, 2002 and purchased 111,800 additional shares after that date. Corkery, however, did not own any shares of Recoton stock before February 27, 2002, purchasing all of his shares sometime after that date. Because Costoff and Corkery purchased the majority of their shares after the date of the first partial disclosure, the defendants argue that the plaintiffs are atypical of the class and that their positions as class representatives are compromised because they will be preoccupied with unique defenses.

The United States District Court for the Southern District of Florida considered such an argument in *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003).   In that case, the court focused on whether class representatives were exposed to the same pattern of fraudulent conduct as other class members and whether damages for the representatives and the other class members arose out of the same violations of law.   *Cheney*, 213 F.R.D. at 494.   After finding that the class representatives were exposed to the same fraudulent scheme as the class as a whole, the court held that "although some factual differences exist between [one proposed class representative] and other members of the class, the court does not find that the purchase after the revelation of fraud bars a finding of typicality."   *Id.*   Numerous other courts have come to the same conclusion.   *See, e.g., Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005) ("We reject the argument that a proposed class representative in a fraud-on-the-market securities suit is as a matter of law categorically precluded from meeting the requirements of *Rule 23(a)* simply because of a post-disclosure purchase of the defendant company's stock."); *CV Reit Inc.,* 144 F.R.D. at 698 (finding that class representatives purchasing stock at the beginning of the class period adequately represented class members purchasing stock at the end of the class period because the claims arose from the same alleged course of conduct).

In the case at bar, Costoff alleged that all of the proposed class members were the victims of the defendants' scheme to mislead the public as to the true value of Recoton stock.   As such, Costoff and Corkery  have an incentive to prove the fraudulent scheme.   Furthermore, Costoff purchased 48,200 of his shares prior to the February 27, 2002 disclosure, and is, therefore, similarly situated to those class members who purchased before that date.

-25-

The defendants also argue that the typicality requirement is not satisfied because Costoff admits that some members of the class did not rely on the market fairly to set the price of the stock.  They cite to a request for admission in which Costoff admitted "[t]hat at the time some members of the Class bought Recoton common stock, they did so in the belief that the market price of Recoton common stock did not reflect its true value."  Myers Decl. ¶ 50; Doc. No. 210-56 ¶ 10.  Costoff now clarifies the admission with respect to his own belief, averring that based on his evaluation of the publicly available information, the stock price would go up and the market price was not inflated due to fraud.  He has filed a declaration, in which he states that he believed that the market price for Recoton stock was valid, and he did not have any knowledge that it was inflated by fraud.  July 2006 Costoff Aff. ¶¶ 6, 7.

In *In re Amerifirst Securities Litigation*, in analyzing a claim that the class representatives did not rely upon the integrity of the market, the United States District Court for Southern District of Florida stated that "the possibility that a unique defense exists against the claim of a representative does not necessarily foreclose class certification."  139 F.R.D. at 428.  The court held that the plaintiff's reliance on the market is a question of fact that is not resolved at this stage of the proceedings.  *Id.*  "Thus, the law in this Circuit is that . . . a representative's . . . degree of reliance will [not] preclude satisfaction of the typicality requirement on a motion for class certification."  *Id.; see also Cheney*, 213 F.R.D. at 492 ("[C]ourts facing similar circumstances, where a named Plaintiff did not rely on stock price, have held that such evidence alone does not constitute a rebuttal of the 'fraud-on-the-market' theory.").  Accordingly, any issue of fact about Costoff and Corkery's reliance on the market is insufficient at this stage of the proceedings to undermine the other evidence of typicality.

-26-

D.      *Adequacy of Representation.*

The defendants assert that Costoff and Corkery are not adequate class representatives because the timing of their purchases of Recoton stock and their sales of Recoton stock during the proposed class period will require them to present the case in a way that may be antagonistic to other class members whose trading history differs from their own.

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class."  The purpose of this rule is to "protect the legal rights of absent class members."  *Kirkpatrick*, 827 F.2d at 726.  The adequacy requirement involves two factors: (1) whether plaintiffs' counsel is qualified, experienced, and generally able to conduct the litigation, and (2) whether the class representatives have interests antagonistic to the class.  *Id.* at 728.[7]

The defendants rely on the analysis in *In re Seagate Technology II Securities Litigation*, 843 F. Supp. 1341 (N.D. Cal. 1994)("*Seagate*"), in support of their argument that Costoff and Corkery's approach to the case may be antagonistic to the case of other proposed class members.  As the defendants acknowledge in their response brief, numerous courts, including the courts of the Eleventh Circuit, have not adopted the reasoning presented in that case.  Doc. No. 209 at 9.

In *Seagate,* the court recognized that there could be a conflict between class members who sold stock on a particular day and those who bought stock on the same day when there had been a partial disclosure of the fraud on the market.  *Seagate*, 843 F. Supp. at 1359.  The court reasoned

---

[7]      The defendants raise no objections regarding the qualifications of Costoff's counsel.  Furthermore, the biographies of these attorneys demonstrate that they have significant experience in federal securities class actions and that they are qualified.  Consequently, the first factor of the adequacy requirement has been satisfied.

that the person who sold the stock would seek to prove that the price inflation was minimal on the date of sale, while the purchaser of the stock would seek to prove that the price inflation was greater on the same date, that is the date of purchase.  *Id.*  Based on this possible conflict, the court held that the plaintiff must present evidence demonstrating that this possible conflict would not interfere with the class representatives' obligations to represent the class.  *Id.* at 1365-67.

In *In re Miller Industries, Inc. Securities Litigation*, the United States District Court for the Northern District of Georgia questioned whether it should apply the reasoning of *Seagate*.  186 F.R.D. 680, 687 (N.D. Ga. 1999)("*Miller*").  That court noted, "[t]he courts addressing intra-class conflicts have generally declined to follow the analysis of *Seagate Technology II*."  *Id.* (citing *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 69-71 (S.D.N.Y 1999); *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D 377, 394-95 (D.N.J. 1998); *Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.*, Nos. 1:95-cv-141, 1:95-cv-290, 1996 WL 739170, at *6 (W.D. Mich. Sept. 27, 1996); *In re Intelligent Elecs., Inc. Sec. Litig.*, Civ. A. No. 92-1905, 1996 WL 67622, at *4-5 (E.D. Pa. Feb. 13, 1996)).  The *Miller* court observed that these courts declined to follow *Seagate* because the class conflicts are largely theoretical at the class certification stage and are likely to exist in every large securities class action.  *Id.*  Further, it noted that *Seagate* was not followed because the potential for intra-class conflicts is peripheral to the main class issues of misrepresentation, scienter, materiality, and causation.  *Id.*  Consequently, the *Miller* court decided not to follow the rationale of *Seagate*.  *Id.*  The court stated that "[g]iven the strong weight of authority against the reasoning of *Seagate Technology II* and the Eleventh Circuit's inclination to certify classes in securities-fraud cases, the Court rejects the Defendants' contentions that the alleged intra-class conflicts should preclude class certification."  *Id.*; *see also In re Healthsouth*

*Corp. Sec. Litig.*, 213 F.R.D. 447, 462 (N.D. Ala. 2003) (stating "the two district court cases

within the Eleventh Circuit that have addressed these issues have declined to follow *Seagate II*.").

In the present action, as was the case in *Miller*, the issues raised by the defendants are

largely speculative and are most likely present in every securities class action case where there has

been a partial disclosure.  The defendants present only possible conflicts without any evidence to

show that such conflicts actually exist.  Accordingly, I recommend that this Court follow the lead

of the other courts in this circuit, decline to follow the analysis of *Seagate*, and conclude that the

stock transaction history of Costoff and Corkery does not render them inadequate class

representatives.[8]  Based on the foregoing analysis, the adequacy requirement has been met.

   E.     *Rule 23(b)(3) Requirements.*

As discussed above, along with the four requirements of Rule 23(a), Rule 23(b)(3) must

also be satisfied before a class will be certified.  Rule 23(b)(3) requires that "questions of law or

fact common to the members of the class predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy."

   1.     *Predominance.*

The defendants argue that the class should not be certified because individual issues

between the class members predominate over common questions of law or fact.  Specifically, they

---

   [8]     At oral argument, counsel for the defendants argued that Corkery's health problems
might preclude him from acting as a class representative.  *See* Doc. No. 214 (stating that Corkery
"was in the hospital and too ill to review and sign an affidavit").  Counsel for Costoff represented
that Corkery's health problem was temporary and had resolved.  As there is no evidence that
Corkery is not well enough to serve as a class representative, this issue merits no further
consideration.

contend that issues of materiality differ depending upon when each class member purchased stock in comparison to the various disclosures Recoton made.

The issue of individual reliance is not of great concern at the class certification stage in a fraud-on-the-market case such as this one.  *See Lipton v. Documation Inc.*, 734 F.2d 740, 746-47 (11th Cir. 1984); *Powers v. Stuart-James Co., Inc.*, 707 F. Supp. 499, 504 (M.D. Fla. 1989) ("Under a 'fraud on the market' theory, questions of individual reliance are not sufficient reason to deny class action status.").  "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . .  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the statements."  *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).  Under the fraud-on-the-market theory, a presumption of reliance exists where investors purchase securities at a price set by an open market because, in doing so, the purchaser relies upon the integrity of the market to set the price.  *Tapken*, 1992 WL 178984, at *29.  Consequently, to invoke the presumption of reliance, the plaintiffs must show that the stock traded on an efficient market and that the misrepresentations artificially inflated the stock price.  *Avery*, 2005 WL 1205607, at *8.

The arguments concerning materiality and damages also need only be briefly addressed. "[A]n inquiry into materiality of the various alleged misrepresentations and nondisclosures during the class period would . . . be inappropriate at this juncture for it delves into the merits of the case."  *CV Reit, Inc.*, 144 F.R.D. at 699-700 (citing *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 94 (S.D.N.Y 1981)).  As discussed above, the plaintiffs need not present proof that individual class members materially relied on the alleged misrepresentations as long as a common

-30-

course of conduct has been alleged.  *In re Amerifirst Sec. Litig.*, 139 F.R.D. at 432-33.  As to the

defendants' arguments concerning damages, "the courts have held that individualized

determinations of damages do not defeat class certification."  *CV Reit, Inc.*, 144 F.R.D. at 699

(citing *In re Alexander Grant & Co. Litig.*, 110 F.R.D. 528, 534 (S.D. Fla. 1986)).  Thus, the

predominance requirement has been satisfied.

> 2.      *Superiority.*

The second prong of Rule 23(b)(3) requires that a class action be superior to other methods

of adjudication of the controversy.  The only objections raised by the defendants as to superiority

are that a class action is not appropriate because the predominance requirement has not been

satisfied and because individual investors have a financial incentive to bring individual claims.

Doc. No. 209 at13-14.  I have addressed these arguments above and again find that they do not

preclude the Court from certifying the proposed class.

As it has been previously noted, "[i]t is well-recognized that class actions are a particularly

appropriate means for resolving securities fraud actions."  *In re Amerifirst Sec. Litig.*, 139 F.R.D.

at 427.  As discussed above, the proposed class satisfies the numerosity requirement, common

questions predominate, and judicial economy favors class status.  Therefore, the superiority

requirement of Rule 23(b)(3) has been satisfied.

> F.      *Defendants' Request to Truncate the Class.*

In the alternative, the defendants seek to limit the class period, exclude individuals who

held no shares of stock as of the close of the class period,  and divide the class into 28 subclasses.

### 1.   Class Period.

Costoff asserts that the class period should run from November 15, 1999 to August 14, 2002.  The defendants contend that the class period should not begin until March 30, 2000, the date of Recoton's press release announcing its year-end earnings for 1999.  They submit that the class period should end either on November 14, 2001 or February 27, 2002, because by those dates individuals interested in Recoton stock had all of the information necessary to conclude that the problems with obsolete inventory were affecting and would continue to affect the value of Recoton stock.  Doc. No. 209 at 14-17.

With respect to when the class period should begin, defendants rely upon the Form 10-K Recoton issued on March 30, 2000.  In it, Recoton disclosed that its "net sales compared to the previous year . . . were down at InterAct."  Myers Decl. ¶ 13 & ex. J, item 7.  The defendants claim this was the first time that Recoton acknowledged that it had excess inventory.  Doc. No. 209 at 18.  Costoff, however, alleges that the class period should begin on November 15, 1999, the date on which Recoton filed its September 30, 1999 10-Q, which was silent about Recoton's large supply of obsolete inventory.  Doc. No. 140 ¶¶ 30-32.

As courts have noted, "'[t]he definition of the class is a matter within the broad discretion of the district court.'"  *Tapken*, 1992 WL 178984, at *32 (quoting *Battle v. Pennsylvania*, 629 F.2d 269, 271 n.1 (3d Cir. 1980)).  Furthermore, when there are substantial questions as to the length of the class period, a broader time period should be certified.  *Id.*  In previous orders, this Court found that the allegations in the complaint were sufficient to state a cause of action for fraud beginning on November 15, 1999.  Doc No. 139 at 12-13, 33 (finding that other than his allegations relating to loss causation, Costoff's allegations were sufficient); Doc. No. 165 at 18

(finding that Costoff had pleaded loss causation).  The defendants have not presented any new evidence sufficiently demonstrating that they did not know of Recoton's obsolete inventory when its September 30, 1999 10-Q was filed.  Consequently, November 15, 1999 is an appropriate date to begin the class period.

The defendants also ask the court to shorten the ending date of the class period.  Some courts have held that "'the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market.'" *Tapken*, 1992 WL 178984, at *32 (quoting *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 82 (D. Md.1991)).  However, when "'a substantial question of fact [exists] as to whether [a given] release had cured the market . . . the broader time period will be certified.'" *Id.* (quoting *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. at 82); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 307 (S.D.N.Y. 2003) ("[A] class period should not be cut off if questions of fact remain as to whether the disclosures completely cured the market.").

In the present action, there are substantial questions of fact as to when curative information was disseminated to the market.  As the Court found in an earlier order entered in this case, Recoton's SEC statements "fail to sufficiently reveal the inventory risk at Recoton, a risk that would later reveal itself as a 'primary cause' of Recoton['s] losses and ultimately be subject to charges of $12.8 million in 'inventory writedowns' and $30.893 million in 'inventory impairment.'" Doc. No. 183 at 8.  The newly submitted evidence does not change the Court's previous conclusion.

As discussed in the statement of facts above, none of the disclosures made by Recoton specifically revealed that the reason for InterAct's poor performance was because it had

substantial inventory that had become obsolete.  Further, in the early statements, Recoton

expressed optimism about InterAct's future.  Doc. No. 210-48 (Recoton's February 27, 2002 press

release stated that InterAct would regain profitability by the end of the year).  Furthermore, as

Costoff contends, the substantial drop in the price of Recoton stock after the August 14, 2002

disclosure of the need to write down inventory at InterAct is telling evidence that the earlier

disclosures had not been complete or curative.

Consequently, the determination of which of the three possible disclosure dates suggested

by the parties as the date on which curative information reached the market is a factual issue and is

not to be determined at this stage of the proceedings.  Therefore, I recommend that the class be

certified for the period between November 15, 1999 and August 14, 2002.[9]

> 2.  *Individuals Who Held No Shares of Stock as of the Close of the Class Period.*

The defendants request that the Court exclude from the class individuals who did not hold

shares of stock at the end of the class period.  Doc. No. 213 at 18.  In support of this argument, the

defendants rely upon the Supreme Court's statement that "if . . . the purchaser sells the shares . . .

before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  This argument is premature

because there is no evidence that there are class members who sold all of their holdings of

Recoton stock before the relevant truth began to leak out.  Therefore, I recommend that the Court

---

[9]  The defendants also argue that if the Court is inclined to certify a class period through August 14, 2002, the class period must nevertheless end on the last date that a class member purchased stock before the August 14, 2002 disclosure.  The Court need not reach this issue now.  When individual class members last purchased stock is a fact specific finding that cannot be determined at this stage of the proceedings.

not exclude individuals who did not hold Recoton's shares at the end of the class period from the class at this stage of the case.

> 3.    *Subclasses.*

The defendants' final request is that the Court create 28 different subclasses based on the dates on which class members bought and sold Recoton stock, such as those who bought stock at the beginning of the class period and held it to the end of the class period, those who purchased after a partial disclosure, those who bought and sold throughout the class period, etc.   The evidence is insufficient at this stage of the proceedings to conclude which of the hypothetical sets of stock transactions exist.   Furthermore, the differences in trading histories may be susceptible to resolution at the damages stage, rather than by creating subclasses.   Accordingly, it is premature to address the issue of subclasses.   *See In re Miller Inds., Inc. Sec. Litig.*, 186 F.R.D. at 687 ("The alleged intra-class conflicts are primarily with respect to damage issues.   The Court believes that it is premature to address the issue of creating subclasses for damage calculations.").

## V.    **RECOMMENDATION**.

For the reasons stated herein, I respectfully **RECOMMEND** that the Motion for Class Certification, doc. no. 197, be **GRANTED**, and, accordingly, that the Court certify a plaintiff class consisting of all purchasers of the common stock of Recoton Corporation between November 15, 1999 and August 14, 2002, excluding the defendants and other individuals associated with

Recoton, Kezsbom or Borchardt as stated in the motion, and appoint Glenn Costoff and Thomas

Corkery as representatives of the class.

Failure to file written objections to the proposed findings and recommendations contained

in this report within ten (10) days from the date of its filing shall bar an aggrieved party from

attacking the factual findings on appeal.

Recommended in Orlando, Florida on October 20, 2006.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy